at all? Good morning, Mr. Rabinowitz. You have reserved two minutes for rebuttal, and you can begin whenever you're ready. Thank you very much, Your Honor. May it please the Court, good morning. We're here because the Court below found that a housing application policy that the defendants, counterclaimants, instituted in 2019, although the Court found that it was lawful in testing income to find out if the applicants were able to pay the rent, the Court found that that policy caused a disparate adverse effect on the applicant body. Again, specifically, persons with housing vouchers that paid only a part of the rent. The Court did not find it was lawful as to people with government housing vouchers that paid all of the rent. Now, the Court, we believe, made clear error in finding an adverse disparate effect because the Court didn't look at all of the statistics correctly. What this case turned on below was an expert on the plaintiff's counter defendant side, an expert's unsupported speculation about the validity of vouchers that were presented for certain apartments. We have the issue that government vouchers here, this is a group of people who were allegedly discriminated against, government vouchers for rent have a certain limit. You can't rent a $10,000 a month apartment with a $2,000 a month voucher. The voucher will not pay anything towards that. And in this case, the people, the applicants involved would have been unable to pay the rent without their vouchers. And the question is But I thought the question here was what does it mean when on Goldfarb's spreadsheets they have, what's an insufficient voucher? Is that the category, that was the label put on them? That's what you're talking about here. I thought that the problem was that there was basically dueling expert testimony about what that meant and whether it was a label that was assigned even-handedly to people. In other words, with a policy that was provided or was applied in a different way to people without vouchers, so that the idea is, well, we don't know how often does the landlord, when somebody has an insufficient voucher, say, oh, you know what, I have a cheaper apartment you might want to look at. Whether that offer of a cheaper apartment was made perhaps more often to people who could pay full freight, less often to people who were coming in with a partial voucher, and that there was basically a paucity of evidence in the record as to whether this was applied in an even-handed manner, and therefore the judge says, well, if there's not something there that tells me that it was applied even-handedly, I've got to figure out does the data stay in the denominator or not, and given the uncertainty, I'm going to leave it in. Am I characterizing accurately the judge's reasoning, or do you think the judge did something different here? The judge did do something different. The judge looked at the question of insufficient vouchers, and I think it's not disputed that if the applicants had insufficient vouchers, in effect they didn't have any vouchers. So they were not being discriminated against on the grounds of source of income, because they didn't have a government source of income for that apartment to be discriminated against. So what the judge did when he decided to essentially deem everyone who was denied for insufficient voucher to have a sufficient voucher, which is essentially what he did, was it's on S.P.A. 30, it's page 22 of his opinion, and that may be, did I get the right page? Yeah, page, sorry. page 22 of his opinion, S.P.A. 32 in our main brief, and here's what the court said. The court finds that Dr. Steele's methodology, that's a plaintiff's expert, of including insufficient voucher as a denial category, meaning that insufficient vouchers were going to be treated as sufficient, was proper because it accounts for, and the judge quotes his expert, more than one out of four of applicants with subsidies. Which could raise the inference that maybe they're not applying that category the same way, denying people an apartment because their voucher isn't enough, or denying people an apartment because their reported income isn't enough, that they're not necessarily applying it consistently. We just don't know whether they're always turning to someone and saying well, you know what, you don't qualify for this apartment, but I've got something cheaper. Or in the case of the vouchers, I guess there was another twist of, well sometimes you're allowed to say well, I know you've got an 80% voucher, I know that normally you're only supposed to kick in a certain amount of money, but under the voucher program, sometimes you're allowed to kick in a little more, let's see if you're eligible to do that. And I thought the problem was that there was insufficient record in the evidence to tell whether Goldfarb was applying that particular criteria in a consistent way. And that given the uncertainty he said well, you know, I don't know how I take these numbers out of the denominator. So just first tell me again, I'm sorry I've added another thing, but is that not what the district court did? No, I've read you the district court's justification. So how is that different from what I just said? I thought that was the reason. I thought one of the reasons, the one out of four was, he said yeah, and you know what? The one out of four denial, that smells a lot like they must have been doing something they were denying a lot of people this, which seems like an odd, a suspiciously high number, which I thought sort of raised suspicion in his mind that maybe that is suggestive of an irregular application of the criteria. And that added to his worries that if there's nothing in the record suggesting that they're applying this particular criteria in an even-handed manner and it winds up that there's a high level of rejections on this criteria, that just adds to the uncertainty and therefore justifies the judge in saying well, I'm not taking that out if I don't know what that thing means. In answering that, you're suggesting that the district court just relied on the number of them, but in the special appendix on page 32, the district court said I find Dr. Steele's methodology of including insufficient vouchers of denial proper. And the expert testified to multiple reasons why there was too much discretion in that decision making that allowed them to potentially find people to be insufficiently funded, even though, as Judge Nardini was pointing out, there's all sorts of exceptions. Section 8 could turn from 30 percent to 40 percent. So all of that was part of the expert's testimony. Well, let me talk about that aspect of it. But first let me just mention the expert only challenged 15 out of 139 insufficient voucher findings. And from that, the court inferred that the whole 139 should be treated as if all those insufficient vouchers were sufficient. Your client has an obligation at that point if there's a large number of these insufficient voucher denials and an expert pulls out a number of examples of situations where no, this was sufficient. The voucher could have covered it, they just didn't exercise the discretion properly or didn't look into it. Why doesn't it then, as Judge Nardini was pointing out, with the lack of record evidence as to what the justification was for all the vouchers to say I'm going to keep those in because it's not clear to me that in fact their decision that it was insufficient is the proper one. Just look at every single voucher and make a determination. Sorry, I didn't catch that last part about every single voucher. In order for an expert to conclude that this category of rejections is problematic and should be included in the statistics, it doesn't have to be that every single one of them was an error. It just has to be there's a lot of discretion, there's a big number, and there's a lot of instances where it could have been sufficient and you're going to determine that it was not. Well, let's talk specifically about what that expert said because I think the actual statements by the expert are important. His testimony on this was at JA Appendix 1153, it's paragraph 188 of his written direct testimony. And he says, indeed more than 15 applicants were denied on the basis of voucher insufficiency where the monthly rent was less than $50 higher than the payment standard. So before I get to the rest of it, immediately he's saying that as to these 15 applicants, their vouchers were indeed insufficient. Well, but facially, but I thought there was plenty of evidence that that's not the end of the story because then even if your voucher is facially insufficient under the program guidelines, the next step is consulting with the client or the prospective tenant to see if they're willing to pay a little bit higher and whether out of their own money to supplement it and whether that would be approved. So it's not that if they are more than $50 over, that's the end of the game. Right? Now, I mean, if Goldfarb had a uniform policy that said we will never do that, that might be one thing. But it seems that there was testimony, well, sometimes we look at it, sometimes we don't. So again, it was this discretionary factor that the judges left with uncertainty because your client didn't put forward evidence about exactly how this discretionary factor was exercised. Well, actually the client did put forth evidence. The testimony was that when they had, let me back up a second, it's not every voucher program in which the applicant is allowed to add money. In fact, the only one that was clearly testified to was Section 8. There were five other programs in this case. And what the expert who was giving this testimony said was some of these applicants may have been able to pay that additional rent without exceeding 40% of their gross income as required by programs like the Section 8 programs. But this expert admitted that those 15 people at trial, who he did not name in his direct testimony, he did not even know which of the programs they were in. But I guess the question that goes back to it, I thought there was no testimony from a Goldfarb employee saying this is exactly how we exercise the discretion, that every time we get somebody who has applied for an apartment with rent that would exceed the voucher, this is the way we operate with every single one of them. And since we don't know what they do, I thought the impression I got was the expert said, look, some of these people might have been able to pull it off. And we don't know whether they're people that Goldfarb said, well, let's see if you can pull off the extra contribution or not. And so if we're left with uncertainty about how the landlord operated with these, unless you point me to, maybe I'm missing, some testimony from a Goldfarb employee who said, yes, we have a protocol. This is exactly how we operate with every one of these people, and this is our algorithm for figuring out if they can kick in the extra money or not. I didn't see that. I saw something that said, yeah, well, sometimes we can make exceptions. Sometimes we look at it, but sometimes it doesn't tell us whether they're doing it in an even-handed way. So maybe point me to the Goldfarb employee testimony or depositions where we do have some sense of regularity as to what that disqualification category means. We had two direct testimonies from Trevor Scapper and from Mr. Miller exactly on this point of how they handle it when they get one of these vouchers in a program that might allow, again, if the applicant wants to spend the extra money, if the applicant can afford the extra money, and if the agency will approve it. There's no guarantee here. But Trevor Scapper at, let's see, 1444. Is the affidavit? Yeah. This is, yes, Mr. Scapper's affidavit at paragraph 18, going over to 19, and he says, this is in paragraph 18 on page 1444. A section 8 tenant is required to pay 30% of HUD's adjusted gross income for rent. Section 8 tenants can be allowed to pay more to supplement the section 8 subsidy up to 40% of HUD's adjusted gross income, and Goldfarb considers that in its net income calculations. See, and he cites a trial exhibit containing, he cites a particular exhibit containing a calculation sheet comparing the 30% and the 40% calculation. He goes on to say, at times, Goldfarb had to advise section 8 applicants that they might be able to pay up to 40% of their income in rent under that program. That was Mr. Scapper's testimony. Then, Mr. Miller's testimony on this point appears in the appendix at 1456, and this is paragraph 25, and he says, in order to assure that section 8 tenants are not rejected for insufficient vouchers, Goldfarb takes account of the tenant option to add 10% of their income to the rent limits of the section 8 vouchers. In checking for voucher sufficiency, the section 8 applicants' income to the rent limit for the voucher. And the judge acknowledged this. He said that at times, Goldfarb doesn't. That was one of three reasons the expert gave of why it wasn't clear they were exercising the discretion properly, but let's let Ms. Hawk respond to that. You have two minutes in rebuttal. Thank you very much. Good morning. I'm Diane Hawk. I represent the Apelli Fair Housing Justice Center. I want to start by responding directly to Mr. Rabinowitz's point at the end of his comments about Mr. Miller and Mr. Scapper. What is misleading to the court here is, yes, the affidavit that they filed as their direct testimony says what it says, but the court heard cross-examination live. And in the cross-examination, what we established is that, one, the company uses a written income calculator to evaluate each application, and that form does not include a single line or direction in it to do the very calculations that the corporate witnesses claim they do. In addition, they have no written policy. A company with 6,000 apartments, no written policy on when and how to do the calculations, no form on which to do them, and no instruction or training to their employees. So the context for the court was to take the direct testimony plus the cross-examination to evaluate credibility and whether, as you said, Judge Nardeni, there's protocol or regularity, and I believe the court found that there wasn't. And that finding, as all of the other factual findings here in deciding which expert's testimony to rely on, is subject to the clear error standard of review, which the defendants have not even tried to meet within their brief or in their arguments this morning. I know both parties were talking about this as a clear error, but that strikes me as a factual finding. I had been thinking of this case as one governed by abuse of discretion as to whether or not to accept the experts, in a dueling battle of the experts, to decide which expert was, I don't know, more reliable. Why is it a factual finding that's subject to clear error here, as opposed to determining which methodology is sounder, or am I not conceptualizing right? I think you've divided the determination the judge made into two separate parts when it's really one decision that he's making. And that decision, both on considering expert testimony generally, as well as specifically looking at statistical evidence when it's presented and deciding what deference to give, the Second Circuit has said that that is subject to a clear error standard of review. And so that is what happened here. And that means under the standard, we'd have to find that Judge Ramos failed to point in his decision to any evidence whatsoever to substantiate the findings. But he laid out very carefully the multiple reasons that Dr. Steele gave, as well as other factual findings that were the basis then for his determination to give greater weight to Dr. Steele's testimony. And that credibility determination was critical here at the trial level because Dr. White, the expert for Goldfarb, had no experience in housing, did not know any of the housing programs, and often had to acknowledge that Dr. Steele was correct on things that he didn't know because he really was not an expert. That's not really a credibility determination. It's not that anyone was lying. It's just which analysis was more persuasive. Exactly. You're right, Your Honor. It's really about giving weight to it. And you're right, that is less about credibility, but it is about whether or not to rely on the testimony that the expert is giving. And here, Judge Ramos correctly decided to rely on Dr. Steele given his presentation. And you would say that was based in part on his witnessing the cross examination and the answers that were given and how the analysis held up under scrutiny. Absolutely. The cross examination was key here. It was lengthy and Judge Ramos himself participated in the cross examination, questioning each of the witnesses. So he was very engaged in this process. And some of the findings that he makes in his decision are in response to the questions that he presented to the experts in his decision. If we think that his reliance on those voucher insufficient applicants was proper, we don't need to even reach the contact denial category because I think in your briefs you point out if you include the voucher insufficient, there's a disparity of 20 versus 30 percent, which is certainly substantial enough to support his finding, right? That's correct, Judge Bianco. And even Judge Ramos recognized that and there's a sentence in his decision saying that the voucher insufficiency decision is pivotal because while he analyzed the no contact and made a decision, he understood that the voucher insufficiency was sufficient to then determine the answers to the questions. So if you could just, Mr. Rabinowitz didn't mention it today, but he mentioned in his brief that in terms of the 20 versus 30 percent numbers, that improperly excluded the fully subsidized applicants. Absolutely. Can you just address that for me? Yes. In fact, Judge Ramos really had to exclude the full subsidy from the partial subsidy based on this court's past decisions because in a disparate impact case, it's very important to know that the policy applies to the group that is being analyzed. And so here, the full subsidy applicants have a different policy set from Goldfarb than the partial applicants. So if we combine the partial and full applicants together and just look at their outcome, we don't know which part of which policy caused that outcome. And causation is critical for moving to the next step in disparate impact. So that's why they have to be separate. By Goldfarb, moving from the 2015 policy to the 2019, they themselves created the separate subsection, correct? They absolutely created this division because the 2015 policy on its face excluded 97 percent of anyone in the New York City and Westchester County area with a rental voucher or subsidy. So they came up with, frankly, this was their fourth scheme in our view to avoid the law. They had a long history of not accepting the vouchers and then accepting them with a policy that excluded 97 percent and now coming up where they divided the group so they would allow in the few that had 100 percent pay who wouldn't want a rent paid 100 percent and guaranteed by the government. And then they left out those, the largest group of the partial pay to be subject to a policy that wasn't applied even handedly and didn't take into account an issue that wasn't raised yet this morning, the issue that in one of the voucher programs, the program has the discretion to go above the rent limits because the very individuals with the vouchers are those living with HIV AIDS and so they may have special needs, the needs for an elevator to be near their health care and so the agency of the city has the authority to go above the rent ranges. But unfortunately, Goldfarb here insisted on applying a rigid rent cap and not permitting the applicants the opportunity to request the rent range be raised for Goldfarb buildings which often are well-maintained buildings with elevators and near centers with health care, the very thing that HASA clients would need. Can I just ask, I think I know the answer to this question, but you're not taking the position that a landlord couldn't come up with some absolutely lawful and fair rental system for screening tenants that did in various ways take into account their ability to pay the rent including vouchers. You're just saying that in this particular case, they didn't, right? That's correct. In this particular case, this tool of using a minimum income requirement that was not based on the subsidy program formulas. So they were supplanting their own opinion for the evaluations done by the program agencies to evaluate income, to adjust that lower in case households have someone with a disability or have children or have high medical needs. These are all formulations and documentations that each program takes into account and then sets the amount that the tenant can afford to pay at 30% of the tenant's income as a starting point. Goldfart said, no. We're just going to come up with our own formula and our own equation and apply it. Well, we don't have to decide whether that's good, bad, or indifferent, right? That's correct. All we're asked to determine is whether their formula created a disparate impact based on the statistics before us. And if we agree with the district court, that's the end. And we're not opining any more broadly, as I imagine you might raise in other cases, that certain formulas are good, bad, or indifferent, right? That's correct, Your Honor. There is one final piece I want to refer to because the defendants do raise as an issue on appeal the injunctive relief that Judge Ramos ordered. It's our position that that was waived and they provide no basis or explanation within their brief. But if the court were to decide this issue, we believe it should affirm the district court's prospective relief as appropriate, given the factual findings about the 2015 policy, which is what the judge found violated the Federal Fair Housing Act and the City Human Rights Law. And it's from that that the injunctive relief was built in order to prevent discrimination in the future. And both of those statutes, the Federal Prospective Relief. And I also refer you to the amicus brief filed by the National Fair Housing Alliance for more discussion of that issue. And thank you very much. Mr. Rabinowitz, you have two minutes in rebuttal. Thank you, Judge. I would like to make sure that this issue of what Goldfarb was supposed to do with people who came in with insufficient vouchers is framed up properly. Goldfarb, this is a discrimination case. It's not an affirmative action case. Goldfarb is obliged to treat non-subsidized applicants and subsidized applicants fairly. Now, of course, technically there are no subsidized applicants, unsubsidized applicants who have vouchers. So it's hard to make an equivalence there. But Goldfarb established, again, including the insufficient vouchers, a very strong prima facie case. There's no question about that. That's not challenged. The question is, should the insufficient vouchers be included? It was the burden, we believe, once Goldfarb had made out a prima facie case with its statistics, the burden to show evidence of disparate treatment, that Goldfarb was unfairly treating, as you have pointed out or asked, subsidized tenants as against unsubsidized tenants lay on plaintiff counter defendants. When you say unfairly, it means discriminating on the basis of source of income. Yes, that's exactly what I mean. So discriminatory impact without regard to intent, but the numbers, whether the experts showed that the numbers, there was a disparate impact based on the policies adopted with regard to calculating that income and so on, did not mirror the program's rubrics, right, about calculating and add a layer of confusion over the numbers that Goldfarb presented. That issue is different from the issue I'm talking about, but just a word on that. Goldfarb had no access to the calculation of income, net income, that the agencies calculated. It was not given to Goldfarb before Goldfarb had to make... But it knows the standards that are applied. Those are public. Well, yes, but there are some things that Goldfarb can't ask about. These standards relate to... Well, I'm not saying with regard to a particular tenant that you would be asking about what their child care costs are. I'm talking about the definitions used that are established in Section 8 or the different programs. I'm just noting that your use of net income was sufficiently different to create some measure of confusion here, I think, in assessing what the impact of your new policy was on the tenant base. Actually, there was no evidence whatsoever, apart from the fact that it was different from the quantification used by the agencies, that it had any adverse impact on the applicants. There was no proof that Goldfarb's calculation resulted in net income figures that were any different. That was, again, something that the expert on the other side might have tried to prove. He had access to the data, but he didn't try and prove it. Well, he doesn't have to, right? The question is whether there's disparate impact. The whole point of that is to say, are the outcomes sufficiently different? And once you prove that the outcomes are sufficiently different, then you have a disparate impact case. You don't have to trace it back to one particular thing or not. You can say, look, there are 17 factors in this policy. The expert doesn't have to trace it back to one thing or another as long as you can show the outcome is disparate. That's the whole point of a disparate impact. Well, actually, Your Honor, the law has changed since the cases that plaintiffs have cited on proving disparate impact. Well, the last of their cases is from 1991, and it relies on statistics alone. But at least as far back as 2015, the Supreme Court in the Texas Department of Housing case said statistics are not enough to prove disparate impact. You must have robust causation between the disparate impact and some policy of the, in this case, landlord. And there's no such evidence here. There's only speculation that, well, maybe they could have done something differently. And I would add that all the things that the experts... That's not one of the arguments you raised in your blue brief, right? I thought you had an argument about aggregating full subsidy and partial subsidy people. And then I thought you had a secondary argument about including the insufficient voucher people and including the no contact people. Did you also raise a lack of causation, I guess? Well, yes. The Texas Department of Housing case is cited at page 31 of our brief. That's our main brief. And we point out that on page 31, we said there's no gold farm policy to which FHJC pointed that caused the no contact, this is the no context context, statistical difference. That's in the middle of page 31. And we cite the Texas Department of Housing case. So that's not a new point. Time is up. I think we have the arguments. I appreciate your coming in. We're going to reserve decision and have a good day. Thank you.